Good morning, Your Honors. May it please the Court, my name is Kyle McLean and I, along with student co-counsel Paige Atascavage, are appearing on behalf of Paul Juan Santos, the petitioner. We are joined here today by supervising attorneys Tiffany Gates and Gary Watt, and I'll reserve two minutes of my time for rebuttal. And are you splitting argument or are you doing the entire argument? I'm doing the entire argument. Okay. The persecutor bar cannot apply here due to fatal gaps in the record regarding Nexus and Scienter. Mr. Santos never testified that the S-2 persecuted any individual, let alone the individuals that he transported. Though Mr. Santos additionally never testified that he had prior or contemporaneous knowledge during this transport that any individual would be persecuted. Let me make sure I understand the factual record here. As I understand it, Mr. Santos apprehended, or at least took in his custody, individuals that he took to the S-2, correct? Correct. On more than one occasion. Correct. On one of the occasions, at least, on one occasion, he brought them there and heard shots coming from inside the building. That's incorrect, Your Honor. He heard shots. Mr. Santos testifies on page 211 of the record that while in the National Guard, on five or six occasions during the night, he heard gunshots, but not that these gunshots came from the S-2 building. And on page 204 of the record, he specifically testifies that he never heard any noises. Incredibly, I might add, he testified that he never heard any noises coming from the S-2 building. So hearing these five or six gunshots at nighttime during a civil war is not the same as hearing rumors of persecution. It's not the same as a government report indicating that persecution was taking place. It's not the same as being a member of a battalion that is the most notorious for raising civilian towns. What about the statement? The most troubling statement for me is the one on AR-255, where he's asked point-blank, basically, like, didn't you think, you know, blah, blah, blah. And he says, yes, that's the way it had to be. Maybe you could address that, because it seems to me a reasonable adjudicator here could – maybe that statement's debatable, but a reasonable adjudicator could interpret that as his – as him basically saying, yeah, I kind of knew that that is what was happening once I turned the people over. Mr. Santos' statement on page 255 of the record does not speculate – well, it is speculation, but it does not indicate that the S-2 persecuted individuals because the scientific requirement is prior or contemporaneous knowledge. And when he was asked what did he think would happen, that's speculation, and that came with the benefit of 20 years of hindsight. Why do you – just let me read the question, and then you tell me why you think it's speculation. He's asked, did you think to yourself that if they were not cooperative, meaning the people who he turned over, that they might be tortured or killed? And he says, yes, that is the way it had to be. Why do you think that is grounded on pure speculation? Based on the fact that the previous question before that one was, what did you think would happen to these individuals when you transported them? He said, if they cooperated, they would be let go. And there's another point in the record, I believe – Well, right, but that's the problem. Then he's asked, well, what if they didn't cooperate? Didn't you know, didn't you think that they would be tortured or killed? And he says, yes, that's the way it had to be. Correct, Your Honor. But did you think that was what happened? That doesn't indicate prior or contemporaneous knowledge. He must have known when transporting – for the persecuted bar to apply, he must have known when transporting these individuals that they would be persecuted. Well, let's go back to your answer to my first question. I'm looking at page 223 of the record. These were suspected guerrillas you would turn over to S-2, yes. Okay, you never worked in the S-2 building, no. But you would hear gunshots coming from there, yes. So he did hear gunshots coming from the building, didn't he? Well, if you look at his answer on page 223 of the record, he was cut off. That's what I'm looking at. Yes, Your Honor. He was cut off. He said but, but he was unable to finish his sentence. But – But, but, I understand. But I have no idea what would have come after the but. But he answered the question the way we ask lawyers to answer questions. Here's the question. What's the answer? Yes, but let me give you an explanation. But he started with the yes. He said, I heard gunshots coming from there, from the building. And the record's, I think, quite clear that after that, he continued to bring people to the S-2. Why doesn't that establish the requisite scienter? It doesn't establish the requisite scienter because he must have known – well, the timeline's unclear, Your Honor. It's unclear when he harbored this belief or when he – No, I'm not talking about the belief. No, I'm talking about as I read this record, and I want you to help me with it, here on page 223, he says, I brought people to the building. I heard gunshots coming from there. And then I believe the record is quite clear that he kept bringing people to the building. So when he kept doing so, didn't he do so with the knowledge that they were going to be persecuted once put inside the building if, in fact, as Judge Watford asked, they turned out to be uncooperative? If I could take a step back, there's a spectrum or a continuum of knowledge, as this Court has held. And so hearing gunshots in a building does not the same as hearing rumors of persecution. In the matter of DR, there are other military police testified. They had knowledge that that – or that the Serbian police were persecuting individuals or were killing hundreds of Bosnian Muslim men. So hearing gunshots, even though he did say he heard gunshots, it's unclear from the record if he heard it from the S2, because on page 213 – But what's the scienter requirement in your view? Isn't it enough that he should have known that he was aiding in persecution? It's sufficient knowledge, Your Honor, according to the matter of DR standard. And so on the spectrum, there's hearing gunshots, there's hearing rumors of persecution, there's government reports indicating that other individuals in his unit knew that persecution was taking place. There's other – there's testimony if he had heard persecution was taking place or had knowledge of persecution. So your view is that the reason your client should win is because while he might have suspected that bad things were going on in that building, he didn't know with the requisite degree of certainty? Is that what you're saying is the defect here in the government's case? That's one of the defects, Your Honor. In regards to scienter, that would be the defect, that he did not have the requisite knowledge because he only speculated based off these gunshots and this newspaper article. So the person has to have just a more definitive level of knowledge in order to trigger the persecutor bar? Is that – that's what you're saying? To rebut the presumption that the bar applies, yes. He must be more sufficient knowledge. Is it a defense – assuming that he has a fair amount of knowledge, let's assume that it would be enough knowledge if he were, say, an officer in the Army or in the National Guard. Is it a defense here that once he enlists in the military, he has no choice but to do this, and he is a low-level operative in the military? Yes, Your Honor. If there's duress, that would be an affirmative defense to the persecutor bar, which I believe this Court or the BIA noted in – my apologies – in the Casey. But the defense isn't necessary because there's no record – there's no indication in the record that the S-2 persecuted any individuals. The S-2 did not – Mr. Santos did not testify that the S-2 persecuted individuals, and the government brings up these El Rescate database reports. But even then, the S-2 is never specifically named, and no individuals in these records are labeled as suspected. But put aside the reports. Your client says, when I arrested people, if they were suspected guerrillas, which is to say those with political opposition to the government, I brought them to S-2. If they were just criminals, I took them to City Hall. Right? So he was sorting out people based on political belief, was he not? Correct. But – And then he says – and I'm looking at page 211 again – he says, I took him in the building, and there were shots. And who was killing – he said someone was killing someone, someone who did not want to cooperate. And so why doesn't that provide the sufficient evidence to show that he was – you know, the government's other records and reports and everything. But just from his own testimony, doesn't that establish that these – that the folks were being persecuted by S-2 because of their political beliefs? No, Your Honor, because Mr. Santos' acts must have played a material role in actual persecution. And the only evidence that an individual he transported was persecuted was in this newspaper article that he read. But he never testified when discussing this newspaper article that the S-2 was the individual. The only evidence that someone he – that he transported was persecuted is this newspaper article. And that newspaper article, when asked about it on page 214 of the record, he said the paper wouldn't come out with the complete, full name, so I don't know if it was them or not. There's no evidence in the record that the S-2 tortured any individual. And also, he said this newspaper article said that someone might have been tortured. He never said that someone was tortured, and he certainly had never said someone was killed by the S-2. Can I ask you this? Let's say that on the basis of the statements on 211 and 223 and 255 that I focused on, let's say that we concluded both that they showed – that those statements showed that he did have the requisite degree of knowledge and that he actually did – I mean, and that the S-2 was in fact torturing people, because that's kind of what he seems to admit on 255. Do you have some other argument about the – I don't know, like the nature of his involvement in the – in the persecution? It's not – it's, you know, it doesn't rise to the level that would – that would be sufficient. Is there some other ground that your client could prevail on if we, you know, we rule against you on knowledge? We say that there was enough to show that torturing was happening. Is there something else that you have? Certainly, Your Honor. The Neghisi duress argument does also play a role here. Mr. Santos testified that he was conscripted into the National Guard and that it was mandatory – I'm sorry, the 6th Brigade – and that it was a mandatory service for every 18-year-old male in El Salvador at the time to serve in the National Army. And then once he left the National Army, he did voluntarily join the National Guard, but only after four suspected – well, guerrillas, not suspected guerrillas came and tried to kill him. They went to his home and made him – he had to escape from his home and run into a field of banana leaves, which they then burned down. And so Mr. Santos, because of his fear for his life in that instance, had to then go re-enlist in the National Guard because that was the only way he felt that he could be protected. So even if there was nexus and there was scienter, he had duress due to the fact that he was conscripted in the first instance and only rejoined the second time due to the fact that he feared for his life. There may be evidence that supports this argument. Was it exhausted? Hello? There's no ruling on this duress argument, is there? No, Your Honor. The IJ and the BIA simply state that – or only looked at the persecuted bar. They never considered an affirmative defense under duress. Well, but it was presented to them as an affirmative defense of duress? Or are you just saying there's evidence that would support it? I don't believe it was presented, Your Honor. So it was you didn't exhaust that argument? Correct, Your Honor. But this Court should still consider that – Well, can we consider an argument not exhausted before the BIA? No. My apologies, Your Honor. I was saying this Court should still consider that the nexus and scienter here haven't been met. Right. I understand. Yeah. Yeah. Due to the fact that there's no evidence specifically linking Mr. Santos's act to a material role in persecution through nexus, and there's no evidence that he knew with the sufficient knowledge while transporting these individuals that they would be persecuted. And absent such a finding, this Court should – the persecutor bar cannot apply. These gunshots are not the same as hearing rumors of persecution. This newspaper article is not the same as stipulating that hundreds of individuals you've transported have been killed, like in matter of DR. The speculation that that was the way it must have been is not the same as testifying from other agents that this persecution was taking place. So the evidentiary provided – the evidence provided in matter of DR demonstrates far stronger that the applicant could not rebut the presumption. And Mr. Santos credibly testifies that he never heard persecution, never heard rumors of it, never witnessed it, and never had any reason to suspect persecution was taking place. Why don't we have you save the rest of your time, and we'll hear from the other side, and then you'll rebut. Thank you. Good morning again. This case is ultimately a dispute over the Board of Immigration Judges' interpretation of the facts, interpretation of what his testimony meant. The Board ultimately found his actions assisted in the persecution of others, and this was based on he admitted to assisting and assisting in the delivery of suspected guerrillas to the S2. He knew that the S2 may have persecuted the suspected guerrillas. This belief was based on him admitting that he thought that if the people he arrested weren't cooperative, they might be killed, saying this is the way it had to be. He admitted that he heard gunshots, which he believed had to be soldiers shooting at the uncooperating people not willing to cooperate. He said the gunshots came from the S2 building, and that they led him to suspect the S2 was torturing or killing people. Finally, he said he never saw again the people he turned over to the S2. Now, this evidence is certainly enough to indicate that the persecutor bar may apply, and that is important because that's the burden, the regulation dealing with the competence burden. Okay. And assume all that evidence is true. Your friend's argument is that may be true, but it doesn't establish the requisite scienter. So what scienter is required under these circumstances? Well, under DR2, no actual knowledge is not required. The issue is whether the knowledge is sufficient to know that the actions may assist in persecution. So although he didn't know for certain, he did know that his actions may assist in the persecution of these suspected guerrillas on behalf of their political opinion. So this evidence, the burden regulation essentially holds. Well, under the INA, by statute, the alien always has the burden to show eligibility for relief from removal. That includes showing that the bar doesn't apply. But rather than requiring aliens to disprove it in every case, the Attorney General issued a regulation stating that only if the evidence indicates the bar may apply does the alien then have the burden. And all that testimonial evidence I just discussed indicates the bar may apply. How can Mr. Santos come to the attention of the government? Why is he in proceedings? I believe he filed an affirmative asylum application. But, Your Honor, I'm not certain on that. I think he's been in proceedings for almost 30 years, hasn't he? He had an application pending, I believe. I can't tell you. I thought it was in 1990 that he first applied for relief. He didn't apply for asylum until he got into proceedings. So the question in the record doesn't make clear how he got into proceedings. Right. The notice to appear was served on him in 2008. And he arrived in 1989? Right. He filed an affirmative asylum application in 1989. So he filed an affirmative application on entry? That's correct. Well, yeah. During the year of entry. He's been in proceedings forever. I don't understand why it has taken this long to get to where we are today. Do you have any sense as to what? No, Your Honor. This is a rather old case, obviously. But this time period, in my experience, I've seen a lot of cases that were very delayed from this particular time period. I'm not sure exactly what was going on, and a lot of them were from Central America. We don't see delays like this as much anymore. Well, what bothers me about this, and I'm not sure how relevant it might be legally, he's lived in this country for a very long time. He and his wife have three citizen daughters. He and his wife are both gainfully employed but at low-level jobs. Their combined income is enough to support the three daughters. His wife's income, if that's the only support, she works basically as a housekeeper at one of the hotels, may or may not be. This is going to impose significant hardship. I'm less concerned about Mr. Santos than I am about the rest of the family. In a case where he's a very low-level person with no direct involvement in any torture or killing, he is doing his job. This one's a tough case for me in the sense of, you know, where's the fairness here? He's been here a very long time with circumstances I've just described. Yes, I understand that, Your Honor. I don't think I would characterize him as just a low-level person with no involvement. Long-standing principles. Well, he's a low-level person who's doing exactly as we've been discussing. I mean, we understand what's in the record. A long-standing principle is the just following orders. It's not a defense to certain crimes. No, I understand that. We're assuming that he doesn't qualify for Nicara relief. The question is, the government probably knew that in 1989, and we're hearing removal proceedings 30 years later after he's established roots. And it's just frustration, I think, more than a legal question. We can't do anything about this. But we do see the human drama in this, and it's a little disturbing that we get to this point. You didn't cause it personally, so I'm not sure how you can respond to it. But I find it difficult for that reason, even though it may or may not be legally relevant. I understand, Your Honor. Can I ask you about the newspaper article? I can't figure out what the relevance of the newspaper article is. At some point, not specified in time in the record, it's not clear whether it's before or after the alleged events occur, he reads a newspaper article that says someone he brought there was killed. You agree to me if he read that article after all the events occurred, it wouldn't be particularly relevant, would it? Certainly. And the record doesn't demonstrate when he read it, does it? No, it doesn't, Your Honor. So shouldn't we just ignore the newspaper article? The newspaper article is just more evidence indicating that he may have known. You say it indicates that he may have known, but how does it indicate that he may have known if he didn't read it until later? Well, Your Honor, when he's carrying his burden to show the bar doesn't apply, one of the things he could have testified to was, I didn't read the newspaper until after I stopped delivering people. I didn't hear these gunshots and come to the conclusion that people were being killed until after I had done this. That's part of his burden to show the bar doesn't apply. I understand your point, Your Honor, and I don't disagree that the newspaper by itself is a strong piece of evidence. My next question, because I'm focusing on evidence other than his testimony for a moment, is we have a report from a human rights group about things that allegedly occurred, and I suspect they did occur. Why is that admissible? It's hearsay. I understand not all hearsay is barred, but how do we test the reliability of those reports? Well, there was no objection to its admission, Your Honor, so it's unexhausted. But the evidence is actually corroborating evidence because it corroborates what he's saying, that he suspected these people may have been tortured and killed, and the evidence is showing, yes, there were human rights violations going on in these places at that time. And was your colleague correct in indicating that no duress defense was raised in the agency? That's correct, Your Honor, and the existence of a duress defense isn't settled yet for the persecutor bar. The case called Neguse is currently pending. Right, I understand. But whether or not one is available, one wasn't sought. It's unexhausted. And in any event, being conscripted into the Army isn't generally considered to be a duress defense, unless it's, you know, involving imminent threat of death and the other elements of duress. So, Your Honor, I believe the briefs largely discuss everything else we have to say. I'm happy to answer any questions the Court may have. Thank you. Mr. McClain, you've got two minutes. If I could just clarify, the statement on page 223 of the record, his other testimony makes clear that he had no knowledge of where these gunshots were coming from, what was taking place, or why they were fired. It could have been a misfire or some other accidental discharge. But the standard for Sienta is that he knew or should have known when transporting these individuals that they would be subject to persecution. And these gunshots simply did not provide sufficient knowledge that persecution was taking place. Well, he did believe that people were being executed for not – he says on page 211, you heard a gunshot and believed other soldiers shot somebody not wanting to collaborate. His answer is, it had to be, because nearby there was, that was the only place. Not perfect language, but he did believe at the time they were being executed because of their political beliefs. In response to the government asking him to speculate, he speculated. But he testified on 204 that he had no knowledge. And knowledge is what is required for Sienta. Without this knowledge, the persecutor bar is not met. So if I'm running the train to Auschwitz and I'm like Jordan Schultz, I know nothing. I just deliver the boxcars to the front gate. I don't know what happens there. I haven't assisted in persecution. Well, I think the difference there, Your Honor, is that that's similar to Matter of the Art, where a criminal research specialist testified that based off troop movements, based off the pattern of buses, and the fact that persecution was two miles away from the applicant, it made his statement that he had no knowledge incredible. But the IJ here never made an adverse credibility finding in Mr. Sienta's statements that he had no knowledge. Again, everybody loves to change the hypotheticals at least slightly. Let's assume I truly have no knowledge, and the IJ finds that I didn't. I'm just a guy putting people in boxcars, bringing them to a concentration camp. I haven't assisted in their persecution under your view? No, Your Honor, because if you have no knowledge, the Sienta requirement is not met. And without the Sienta, the persecutor— Not enough that you should have known, or it's reasonable that you should have concluded that. Without any other rumors of persecution, without any government reports indicating that person would have known, regardless, that's insufficient knowledge, Your Honor. Okay. Thank you very much. Thank you. Before we finish with this case, I'd like to say on behalf of the panel that this was an argument on behalf of Mr. Santos presented by the students at Hastings, and I would like to congratulate or compliment both the briefing and the argument. Thank you very much. The case of Santos are now submitted. And we'll take a recess for five minutes.
judges: W. Fletcher, Watford, Hurwitz